## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 95-CT-00437-SCT

*TORY FREEMAN, AN INDIVIDUAL, AND EMPIRE*
*GAS OF BAY SPRINGS, MISSISSIPPI, INC.*

*v.*

*HUSEMAN OIL INTERNATIONAL, INC.*

### <u>ON PETITION FOR WRIT OF CERTIORARI</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 04/05/95 |
| TRIAL JUDGE: | HON. HYDE RUST JENKINS, II |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM R. RUFFIN |
| ATTORNEYS FOR APPELLEE: | BOBBY L. COX |
| | L. JACKSON LAZARUS |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 7/23/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/17/98 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. Huseman initiated this action on July 11, 1993 in the Chancery Court of Adams County alleging tortious interference with business by Tory Freeman, Individually, and Empire Gas of Bay Springs, Mississippi. The matter was tried in August of 1994 and the chancellor ruled in favor of Huseman and granted him judgment in the amount of $72,000.00 against both defendants, jointly and severally. Freeman and Empire appealed, basically asserting that the chancellor's finding was not supported by the facts and evidence in the record as to either liability or damages. We agree, reversing the finding of the Court of Appeals which affirmed the judgment, and render.

### Factual and Procedural History

¶2. Freeman was the manager at Empire Butane of Bay Springs, Mississippi, and oversaw the delivery of fuel to Huseman's oil well sites.[1] Huseman originally made his payment to Empire within thirty days, then started making them every sixty days, and finally only every ninety days or sometimes longer. Freeman admitted, however, that she valued Huseman's account at something over

$500,000.00 per year. Sometime in 1993, Empire hired a new credit manager at the main office, who changed the credit policy to require security for accounts over $5,000.00. Freeman informed Huseman of the new policy and demanded a decision from him as to whether he was to pay in full or what type of security he could provide. At this time, Huseman's balance due Empire was approximately $26,000.00. Huseman requested time to consider the matter. Eventually, Huseman informed Freeman he was taking his company's business elsewhere.

¶3. Freeman thereupon took it upon herself to find out where Huseman had taken his account. She admitted to calling Cynergy, who was not servicing Huseman, and Herring Gas and speaking with Don Cavin, an employee of Herring. Cavin informed her that Herring was servicing Huseman's wells and Freeman thereupon informed him of the situation between Huseman and Empire making inferences that Huseman was a bad credit risk. Cavin made no response immediately other than that he would inform his superiors, which he did. On a subsequent call to Cavin, Freeman made the direct demand that Herring not service the account in order to assist her in collecting Empire's account. It was during this call that she allegedly made accusations that Huseman was passing bad checks, was on a cash-only basis with other service providers, was going into bankruptcy, and other such remarks. Cavin did not comply with Freeman's request, but continued servicing Huseman's wells without any apparent delay. At the time of the trial, Cavin/Herring was still servicing the account.

¶4. Huseman alleged a loss of $700,000.00 to $800,000.00 because he was forced to sell his company's interest in a well known as U.S.A. 17-7.[2] Huseman claimed that Freeman contacted various companies which did business with him and told these companies that Huseman's company was in a financial bind. As a result, he claims that the investors no longer trusted him or his company and Huseman had to sell his interest and resign as operator of the well, though none of these actual investor/owners of this well were called to testify. Nor was there any proof other than Huseman's own testimony that this was an involuntary sale. Freeman denied having called any service providers other than Cynergy and Herring. Huseman also called Jim Traxler, who testified that he declined to invest in one of Huseman's wells in the spring of 1993,[3] because he had heard "rumors" that Huseman was going bankrupt. In particular, he testified that he heard that Huseman could not get fuel to keep the wells running. Traxler testified that he never had any direct communication with Freeman or Empire. Freeman testified she did not know Traxler. The record gives absolutely no indication as to what the source of the rumors were and Traxler was unable to name any particular source. Furthermore, there was no testimony as to whether Huseman suffered any damages from Traxler's failure to participate in Huseman's well.

¶5. The chancellor ultimately found that Freeman actively and purposely interfered with the business of Huseman's company, and the conduct was calculated to cause damage thereto and its lawful business enterprise. The chancellor further found that as a result of this conduct, Huseman suffered financial loss due to his being forced to sell his interest in and cease to be the operator of U.S.A. 17-7 well. Huseman's figure of $700,000.00 to $800,000.00 was based on profits from the said U.S.A. 17-7 well at $4,000.00-$6,000.00 per month over twenty years. The chancellor found that twenty-year longevity for a well was speculative and a figure based on one or two years to be more reasonable. This was apparently the basis of the $72,000.00 judgment although the bench opinion does not directly so state.

**Analysis**

¶6. In *MBF Corporation v. Century Business Communications, Inc.,* 663 So. 2d 595, 598 (Miss. 1995), this Court set out the four necessary elements which must be proved by a preponderance of the evidence to prove tortious interference with a business relationship:

    1. the acts were intentional and willful;

    2. the acts were calculated to cause damage to the plaintiffs in their lawful business;

    3. the acts were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice);

    4. actual damage and loss resulted.

A prima facia case is shown by proving (1) a loss and (2) that defendant's conduct caused the loss. *Id.*

¶7. It was admitted by Freeman, that she purposely interfered with Huseman's business with Herring in her attempt to collect the debt owed to her by Huseman. However, there was no resulting loss or damage because Herring continued to make its delivery to Huseman as usual. Therefore, what was said by Freeman to employees of Herring, is of no consequence and need not be addressed further.

¶8. As to the remaining testimony and evidence, the chancellor found that all four necessary elements had been proven, including the fourth, actual damages. The chancellor found that Tory Freeman had intentionally interfered with current and prospective business relations between Huseman Oil and Jim Traxler, a potential investor in a producing well operated by Huseman, known as the U.S.A. 17-7 well, as well as between Huseman and other current investors. The chancellor found that the interference on Freeman's part was calculated to cause Huseman damage or loss, was without justifiable cause, and caused such loss. Here, the Court finds error.

¶9. As opined by Judge McMillin, writing the dissent for the Court of Appeals,

    Huseman Oil presented evidence that would, in its best light, show a failed attempt by Freeman, acting on Empire's behalf, to tortiously interfere with one of Huseman Oil's existing contractual relationships -- namely, with its new propane gas supplier, Herring Gas. Because this claim was not actionable for the very good reason that it produced no injury, Huseman Oil apparently elected to assert a claim, based solely upon speculation and conjecture, that Freeman was circulating damaging and untrue rumors about Huseman Oil's financial status in the business community at large, and that these rumors caused Huseman Oil to suffer business losses unrelated to the business arrangement between Huseman Oil and Herring Gas.

    The evidence in this record will not support such a claim. There is no evidence that Freeman ever made any disparaging remark concerning Huseman Oil's business practices to anyone other than Tom Huseman and two representatives of Herring Gas. There is no evidence that either of the Herring Gas representatives passed along any of Freeman's disparaging remarks to any other person in the business community, though both of them testified for Huseman Oil at trial, and could have been interrogated on the point. Thus, the idea that rumors of Huseman Oil's poor credit-worthiness alleged to be rampant in the business community can be traced to the efforts of Freeman must be based upon nothing but rank speculation. No judgment so based can be

sustained. *Rudd v. Montgomery Elevator Co.,* 618 So. 2d 68, 72-73 (Miss. 1993).

It must be remembered that interfering with a specific contractual relationship and attempting to generally injure an entity's business reputation are separate and distinct torts. *MBF Corp. v. Century Bus. Communications,* 663 So. 2d 595, 598 (Miss. 1995). Huseman Oil may have proved all of the elements of one tort (an effort to disrupt Huseman Oil's relationship with Herring Gas) -- except for the critical failure to show any injury. Nevertheless, Huseman Oil failed, as a matter of law, in its effort to refashion the defendants' conduct into the second, more general, tort.

¶10. "Findings of fact made by a chancellor will not be disturbed by the Supreme Court unless they are either manifestly wrong, clearly erroneous, or unsupported by substantial credible evidence." *Mississippi State Dep't of Human Servs. v. Barnett,* 633 So.2d, 430, 434 (Miss. 1993), see also *Kelly v. Shoemake,* 460 So.2d 811, 817 (Miss. 1984). This is an old and long established rule, however, here we appear to have the situation whereby the chancellor's findings simply are not supported by substantial credible evidence.

¶11. Admittedly, the first three elements of tortious interference were proven as to Freeman's calls to Herring Gas; however, no damage resulted, as Herring continued to do business with Huseman despite the attempted interference. There was no evidence produced at trial that Traxler had any knowledge of Freeman's escapades other than that he had heard "oil-patch rumors" that Huseman was having financial difficulty, including difficulty obtaining fuel for his production equipment. There was no precise time period stated as to when he heard these rumors. Traxler was unable to attribute the rumors to any particular individual with any direct connection to Freeman or Empire. In fact, other than Huseman's own testimony, there was no direct evidence that Freeman conducted her malicious conversations with anyone other than the two Herring employees. Once this is discounted, the only thing left is Traxler's testimony. In other words, Traxler's testimony, contrary to the chancellor's finding, is totally useless as a basis for connecting Huseman's business problems to Freeman's calls to the butane dealers or for determining damages. Again, to attribute what Traxler stated as resulting in Huseman's loss requires quite a leap of deduction and can only be based on pure speculation.[4] Such speculation and conjecture does not arise to the level of "substantial evidence". The evidence is equally questionable on the issue of damages.

¶12. While it is true that there was some testimony from Huseman's witnesses which did tend to impeach some of the testimony given by Freeman who had been called adversely, and by *arguendo*, even if the chancellor chose to disbelieve Freeman's testimony *in toto*, it was still essential for Huseman to prove each element of liability **and** damages as well as a causal connection between the two with substantial and credible evidence. This simply was not done as to any attempted tortious business interference committed by Freeman or Empire with anyone other than the Herring Butane Company and its employees, which again, did not result in any damage. In fact, the testimony from Huseman indicated that his investors in the U.S.A. 17-1 well became dissatisfied with his performance when another service provider refused to deliver KCl water to the well unless a $300.00 payment was made at point of delivery. Other than Huseman's speculative conclusions and uncorroborated assertions, there was no proof in this record that this incident was precipitated by Freeman's conduct or connected with the failed deal with Traxler; or, that the other investors in the U.S.A. 17-1 well forced Huseman to sell and give up his status as operator of the well.

¶13. Finally, even assuming *arguendo* that there was adequate proof of a causal connection between Freeman's conversations with her competitors concerning Huseman's credit, and Huseman's alleged damages, the plaintiff's proof through Huseman's testimony concerning damages based on projected future production from the well in question of twenty years and based on current gas prices, was not sufficient under this Court's latest holding in *TXG Intrastate Pipeline Co. v. Grossnickle*, No. 94-CA-00507-SCT, slip op. at 21 (Miss. Oct. 16, 1997), wherein the Court also ruled that the chancellor's decision on damages was not properly supported in the record and stated that "[u]nder Mississippi law, plaintiffs bears the burden of going forward with sufficient evidence to prove their damages by a preponderance of the evidence." *Id.* (citing *Piney Woods Country Life Sch. v. Shell Oil Co.,* 905 F.2d 840, 845 (5th Cir.1990)." In *TXG*, specifically addressing calculation of damages based on future oil or gas production, the Court found that several factors must be taken into consideration and that

> all that can be expected is "such certainty as the nature of the particular case may permit" to "enable the trier of facts to make a fair and reasonable estimate of the amount of damage." *Cain,* 458 So. 2d at 1050. At a minimum, proof could have and should have been submitted of prices in the area for high sulphur oil of like gravity reflecting monthly price fluctuations over the period.

*Id.* at 22.

¶14. In this case, Huseman merely gave his projected production and current market prices without citing any basis for his estimation of production volume or longevity, nor did he take into account operating expenses or other cost deductions. The chancellor also found this evidence to be speculative and even the Court of Appeals plurality was at a loss to positively conclude what process the chancellor used in determining Huseman's damages to be $72,000.00.[5]

## Conclusion

¶15. This Court agrees with the Court of Appeals dissent and its analysis of the evidence as to both liability and damages. While Freeman's conduct was reprehensible and her credibility questionable, the evidence presented at trial simply fails, as a matter of law, to be sufficient to support the findings and judgment rendered by the chancellor in this case. There is simply no evidence in this record supporting a causal connection between the tort committed by Freeman and the alleged damages relating to Huseman's subsequent sale of his interest in the U.S.A. 17-7 well and his removal as operator of that well. This judgment is therefore reversed and rendered.

¶16. REVERSED AND RENDERED.

PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.

1. The evidence produced at trial revealed that Huseman is involved in the oil and gas industry, and one of his vocations is that of operator of several existing wells. Among other things, an operator sees to the continued production of oil or gas from these wells on the behalf of various

owners/investors, and the sale of that production to various purchasers. Most of the wells operated by Huseman in the area at issue require pumps and other equipment to extract the oil from the wells which require fuel for operation, as electricity is usually not available at the sites. The most commonly used fuels are propane or diesel. It appears that Huseman had been dealing exclusively with Empire Gas of Bay Springs to supply fuel (butane and/or propane) to wells he had been operating in that area of the state for at least three years.

2. The series of transactions leading up to Huseman's "selling out" of this well transpired several months after the alleged communications by Freeman.

3. Freeman's admitted calls took place in May 1993.

4. Traxler testified that he declined to invest in Huseman's well because of the alleged rumors, and there was no evidence of any damages elicited as a result of his decision. Traxler was not an investor in the well that chancellor used as a basis for the assessment of damages.

5. The Court of Appeals plurality opinion surmised that this figure represented an average production over a two year projected life which the chancellor found to be more reasonable than a twenty-year projected well life. The record does not indicate how the chancellor arrived at a two-year projected well life. However, this figure, as noted by the dissent, does not take into account any deduction for operating expenses or any other expenses.