IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

───────────────

No. 95-60632

───────────────


THE PINEY WOODS COUNTRY LIFE SCHOOL;
RIDGEWAY MANAGEMENT, INC.; D'LO ROYALTIES, INC.;
JAMES H. STEWART, JR.; RUBINETTE STEWART; DIANA
WHITEHEAD STEWART; MILTON MONROE STEWART, SR.;
WILLARD STEWART MITCHELL; VIRGINIA HANSELL STEWART,
Individually and as trustee for the benefit of Mrs.
Carol Stewart Scott, Milton Stewart, Jr. and Thomas
Hansell Stewart; MAGGIE FAIRLEY SPENGLER; THOMAS L.
SPENGLER; JAMES V. FAIRLEY, Estate of, Albert L. Fairley
and Elenor McWane Fairley, Co-Executors of the Estate,
Individually, and all others similarly situated;
AMSOUTH BANK, Bank of Alabama, A Co-Trustee of two
trusts created by the last will and testament of James V.
Fairley; ALBERT L. FAIRLEY, JR.,

                                    Plaintiffs-Appellants-
                                    Cross-Appellees,


        versus


SHELL OIL COMPANY,

                                    Defendant-Appellee-
                                    Cross-Appellant.


───────────────

Appeal from the United States District Court for the
        Southern District of Mississippi
            (3:74CV307WS)

───────────────

April 21, 1997

───────────────

Before GARWOOD, DAVIS and STEWART, Circuit Judges.[*]

───────────────

[*]    Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except

PER CURIAM:

In this diversity case, which has twice previously been before us, defendant Shell Oil Company (Shell), lessee in certain oil and gas leases on property in Rankin County, Mississippi, challenges the district court's determination that it is liable to the plaintiffs, lessors in those leases, for underpayment of gas royalty for the years 1979 through 1982. Plaintiffs complain of the district court's ruling that gas royalties were not underpaid in the years 1985 and 1986. Plaintiffs also complain of the denial of prejudgment interest with respect to the 1979-1982 underpayment. We decline to consider the prejudgment interest matter, and otherwise reject all the mentioned challenges to the district court's rulings.

### Facts and Proceedings Below

The subject matter of this lawsuit is royalty from gas produced in Rankin County, Mississippi. The gas from the Rankin County fields is "sour," that is, it contains more than trace amounts of hydrogen sulfide and other contaminants. Before this gas can be sold on the market, it must be transported to an appropriate facility and processed into "sweet" gas. Shell, lessee in oil and gas leases in which plaintiffs are (or hold under) the lessors, treats the sour gas itself on site at its Thomasville plant in Rankin County, recovering from the original sour gas both

---

under the limited circumstances set forth in Local Rule 47.5.4.

2

sweet gas (dry methane) and elemental sulfur.

In 1970 Shell began efforts to market the gas produced from these fields. It sought buyers only in the intrastate market because it wished to avoid restrictive federal regulations on interstate sales. In 1972 Shell entered into a fifteen-year contract to sell the bulk of its production, 40,000 Mcf per day, to MisCoa.[1] Shell also entered into a similar long-term contract arrangement with Mississippi Power & Light (MP&L), which agreed to take the excess volume produced by Shell's Thomasville facility. Although these contracts were the best available at the time, subsequent developments in the international fuels market quickly resulted in the fixed rates specified in those contracts being far below sweet gas prices available on the open market.

*Piney Woods* I

On December 27, 1974, landowners in Rankin County filed this lawsuit against Shell, their mineral lessee, over royalty allegedly due them from natural gas produced under these leases and processed at Shell's Thomasville plant. The lawsuit was certified as a class action in 1978. The plaintiffs claimed that Shell's practice of computing royalty from the long-term fixed rate contract proceeds was, given the post-1972 gas price inflation, in derogation of their contractual right to be paid "the market value" of the gas

---

[1] An Mcf is 1000 cubic feet. MisCoa is a partnership of two Mississippi corporations, Mississippi Chemical Corporation and Coastal Chemical Corporation.

3

"at the well." In 1982 the district court held a bench trial and found for Shell on almost all claims. *Piney Woods Country Life School v. Shell Oil Co.*, 539 F.Supp. 957 (S.D.Miss. 1982) (*Piney Woods I*).

*Piney Woods* II

That decision was certified for interlocutory appeal under Fed. R. Civ. P. Rule 54(b) to this Court, which, after an extensive discussion of the leases at issue, concluded by affirming in part, reversing in part, and remanding the case back to the district court for further proceedings. *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225 (5th Cir. 1984) (*Piney Woods II*), *cert. denied*, 105 S.Ct. 1868 (1985). The *Piney Woods II* panel made a number of determinations which inform the issues presently before this Court.

First, we concluded that, for purposes of leases that distinguished between gas "sold at the well," for which royalty was based on "the amount realized from sale," and other gas sold, for which the royalty was based on "market value at the well," the gas in question was *not* "sold at the well," and hence its royalty *was* to be based on "market value at the well." *Piney Woods II*, 726 F.2d at 230-233. We thus rejected Shell's contention that the gas at issue from these leases was "sold at the well" so that its royalty would be based on "the amount realized from sale" rather

4

than "market value at the well."[2] Second, this Court held that the lease term "market value" means "current market value at the time of production," not, as Shell had argued, at the time it entered into the MisCoa contract. *Piney Woods II*, 726 F.2d at 238. Third, this Court found that because the pertinent leases provided for the "market value at the well," the lessors were only "entitled to royalty based on the value or price of unprocessed, untransported [*i.e.*, sour,] gas." *Id. at* 240. Fourth, we recognized that while "the best means of determining the market value at the well ... would be to examine comparable sales of *sour* gas at other wells in the area," in the absence of such evidence "[t]he next-best method is to examine sales of sweet gas and sulfur, to determine the market value of the products resulting from processing at the Thomasville plant. Processing costs may then be deducted as an indirect means of determining what a buyer would have paid for sour gas at the wellhead." *Id*. If the plaintiffs were unable to proffer sufficiently comparable sales of sweet gas to demonstrate such a market value, a third means of showing market value, Shell's system based upon the amount actually realized from the sale of

---

[2] This holding applied to the great majority of the leases then at issue, and to all the leases now remaining in dispute. However, at the time of *Piney Woods II*, there was also at issue gas from at least one lease (a "Producers 88 (9/70)" form) which provided that the royalty on *all* gas sold by lease (not just that "sold at the well") was to be based on the "amount realized by lessee, computed at the mouth of the well." *Id*. at 230 & n.6. *See also id*. at 240-41.

5

Thomasville gas-less-processing costs, could be utilized, although this was the "least desirable method of determining market value." *Id.* at 239 (citation omitted).

Finally, we held that Shell could, as had been its practice, deduct processing costs in computing royalty, because, although the royalties were to be based on market value at the well, there were apparently no comparable sales of sour gas, and thus "[p]rocessing costs may then be deducted as an indirect means of determining what a buyer would have paid for the sour gas at the wellhead." *Id.* at 240. "The function of processing costs in determining royalties based on 'market value at the well' is to adjust for imperfect comparisons." *Id.* "The [market] value . . . of the [plant] residue sweet gas reflects Shell's processing costs. . . ." *Id.* at 241. "To determine the correct basis for royalty, processing . . . costs may be deducted from values . . . established for processed . . . gas." *Id.* at 242. However, only reasonable processing costs could be so deducted. *Id.* at 241. We noted that although the district court had not made an express finding on the reasonableness of the processing costs deducted by Shell, "[t]he record would support a finding of reasonability"; and we left that issue "open for further consideration by the district court." *Id.*[3]

_____

[3]  With respect to gas from the lease (or the few leases) on the "Producers 88 (9/70)" form which provided that on *all* gas sold by lessee (not just that "sold at the well") the royalty was based on the "amount realized by lessee, computed at the mouth of the well" (see note 2, *supra*), we likewise held that Shell could deduct

After remand the district court held another evidentiary hearing. The plaintiffs renewed their attempts to produce evidence of comparable sales of processed sweet gas from which a derivative market value for Thomasville processed gas could be established.[4] The evidence adduced showed that the Shell-MP&L "excess volume" contract had been terminated in 1981 and that in 1982 the Shell-MisCoa contract had been modified, reducing Shell's MisCoa obligation to 21,000 Mcf per day. This in turn had freed up gas for the newly deregulated interstate market, which Shell's Thomasville facility entered by means of a new "excess volume" contract with Transcontinental Gas Pipe Line (Transco) in November 1982. During this entire period, Shell continued to compute its royalty payments based upon the net proceeds obtained from these

---

processing costs, because such a deduction was necessary to determine that portion of the price actually received for processed gas at the plant tailgate which was allocable to, and represented the price received for, the unprocessed gas at the mouth of the well. "The . . . sale price of the residue sweet gas reflects Shell's processing costs." *Id*. at 241. Again, only reasonable costs could be so deducted. *Id*.

[4] During this second hearing, Shell offered evidence of an alternative means of determining market value. Shell's model was purportedly based upon the viewpoint of a willing buyer of the Rankin County sour gas and consisted of evidence, culled from its worldwide drilling and processing operations, showing what it would cost to build a facility to process that gas into marketable sweet gas. Shell's model involved not only the price tag for capital expended in the construction and operation of the phantom plant(s), but also introduced variables to account for inflation and the hypothetical willing buyer's assumption of investment risk and profit motive.

contracts, *i.e.*, actual sales less processing costs.

In 1989 the district court rendered a judgment on the merits, finding that the plaintiffs had failed to establish that the market rate for Thomasville processed gas was at any time greater than Shell's long-term contract rate.[5] *Piney Woods Country Life School v. Shell Oil Co.*, No. J74-0307 (W) (S.D. Miss., April 24, 1989) (*Piney Woods III*). Although the plaintiffs' evidence of assertedly comparable sweet gas sales for the years 1979-1986 was not subjected to nearly the same scrutiny by the district court as was their related evidence bearing on the market in 1972-1978, the district court as to the years 1979-1986 relied in part upon federal regulatory ceilings to support its ultimate view that Shell's accounting and payment practice was consonant with the "market value at the well" lease royalty provisions during that period.

*Piney Woods* IV

The plaintiffs pursued a direct appeal from this judgment, bringing the case before this Court for a second time. *Piney Woods Country Life School v. Shell Oil Co.*, 905 F.2d 840 (5th Cir. 1990) (*Piney Woods IV*). In *Piney Woods IV,* this Court discussed the "deregulation" which had made Shell's entry into the interstate gas

---

[5]    The district court also rejected Shell's alternative market value model, finding it "rooted in too much pecuniary speculation and hypothetical supposition." *Piney Woods III,* unpub. op. at p. 9.

market by way of the Transco contract feasible. The Natural Gas Policy Act (NGPA), which took effect on November 9, 1978, segregated gas wells, including those in Rankin County, into two distinct regulatory regimes.[6] 15 U.S.C. § 3315 (section 105 of the NGPA) provided that the maximum lawful price which could be charged for gas produced at wells within its demesne was "the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978." Accordingly, this Court found that, after section 105 became law in 1978, for gas produced from Rankin section 105 wells "the *actual* price Shell was receiving became the *maximum lawful* price that it could receive." *Piney Woods IV*, 905 F.2d at 851.

A different result, however, obtained for those wells falling under 15 U.S.C. § 3317 (section 107 of the NGPA). Under the NGPA, gas from section 107 wells could be sold on the interstate market at the going "market value."[7] Section 107 gas, unlike that from section 105 wells, was thus not legally locked into a maximum price determination based upon Shell's pre-existing contract, but rather

---

[6]    The distinction between these two regimes was based upon specified physical characteristics. The only one that is relevant in this case is drilling depth; those wells over 15,000 feet deep were treated under section 107, rather than section 105, of the NGPA.

[7]    The statute provides that section 107 gas may be sold on the interstate market at the adjusted price calculated from the complex formula set forth in 15 U.S.C. § 3312 (section 102), establishing a ceiling for the "interstate market value" at issue in this case.

was technically eligible for the higher prices available in the interstate marketplace.

As noted, the district court in *Piney Woods III* had found that the plaintiffs' proof of market value for processed Thomasville gas failed as a matter of fact for the years 1972-1986. This Court in *Piney Woods IV* affirmed that finding as to the years prior to the NGPA's enactment (1972-1978), holding that the district court did not clearly err in concluding that the plaintiffs' evidence of comparable sweet gas sales did not show sufficient similarity to the Thomasville processed gas sales. We noted that many of the comparable sales relied on did not reflect relevant nonprice information, such as whether contract terms included variable take or assured take provisions, the length of any commitment, the volumes and quality of the gas, and whether the sale was interstate or intrastate. Other sales relied on were of questionable comparability because they either involved casinghead gas (with BTU values of an unspecified level higher than the Thomasville processed gas), or involved smaller quantities or were for very short terms "which may have reflected one buyer's particular urgent needs." *Id*. at 848. Additionally, we observed that "[e]ven though the buyer of the Thomasville gas would be buying sweet gas (as Shell did process the Thomasville gas), the delivery of that gas still would be uncertain, as all the problems that can occur with the ultrasour gas would directly affect the downstream delivery of

10

the sweet gas." *Id*. at 848. Hence, "it was not clear error for the district court to find that what was paid for other sweet gas in smaller amounts . . . was not an accurate reflection of what the market value of gas from the Thomasville plant would have been," and "the district court was within its discretion to find that the risk inherent in guaranteeing to take large quantities of sweet gas processed from ultrasour gas could not be decoupled from the value of a contract for that sweet gas." *Id*.[8]

This Court, however, vacated the district court's judgment as to the gas produced by section 107 wells after November 1978, and as to all wells after January 1, 1985. We observed that the district court did not give "the same intensity of examination" to plaintiffs' allegedly comparable sweet gas sales for the 1979-1986 period as it had for the 1972-1978 period, and further that "as the nation's and Mississippi's gas prices were far higher during 1979-1982 than in the earlier years, the disparities in comparable markets may not be of sufficient moment during the latter period to explain the discrepancy between prices received by Shell for Thomasville gas and prices received in other Mississippi sales." However, we noted that the district court had also "relied upon regulatory price ceilings as an additional ground to support its

---

[8]    In *Piney Woods IV*, we also observed that the district court (in *Piney Woods III*) "found that Shell's 'plant processing' charges were reasonable," *Piney Woods IV*, 905 F.2d at 843, and we did not disturb that finding.

11

finding . . . for the years after 1978." *Piney Woods IV*, 905 F.2d at 850-51. We then turned to a consideration of the effect of the price ceilings during the years after 1978.

Rejecting the district court's contrary ruling, this Court found that evidence of record, in particular plaintiff's exhibit P-155, a well-by-well, month-by-month listing of Shell's sales proceeds, enabled the district court to differentiate between the origins of section 105 and section 107 gas and thus determine which landowners were possibly entitled to damages. In addition, we determined that particular aspects of the Shell-Transco contract triggered section 105(b)(3) of the NGPA and placed the section 105 gas being sold to Transco under the same pricing scheme as section 107 gas as of January 1, 1985.

Based upon these findings, the *Piney Woods IV* Court remanded the case for a determination of whether Shell owed the owners of property with section 107 wells[9] damages for underpayment of royalties in the years 1979-1986.[10] We also instructed that the same inquiry be made for the owners of section 105 wells in the years 1985-1986. In so doing we observed that "if Shell received from its sales to Transco after December 31, 1984, less than the

[9] These were specified as the Garrett, Spengler, Clark, Edge, and Stevens wells. *Piney Woods IV*, 905 F.2d at 853.

[10] Although we characterize the affected period as commencing in 1979, we recognize that the last two months of 1978 are included within the relevant time frame.

12

market value of the gas sold . . . the royalty owners are entitled to damages compensating them for not receiving their proper share of the true market value" and that "[d]amages will be due to the royalty owners should the district court find on remand that the market value of the gas, limited by the applicable regulatory price ceiling, was greater than the actual proceeds received by Shell for the gas."  *Piney Woods IV*, 905 F.2d at 853-54.[11]

*Piney Woods* V

Following remand, the district court, without holding any further evidentiary hearing, reconsidered the evidence of record and prepared a memorandum opinion and order addressing the merits of the plaintiffs' claims.  The court released a draft of this opinion to the parties in December 1994.  Both parties filed objections, and the district court heard oral argument on these objections in February 1995.  The opinion and order were filed by the district court, with the inclusion of a section rebutting the parties' objections, on June 6, 1995.  *Piney Woods Country Life School v. Shell Oil Co.*, No. 3:74-cv-307WS (S.D. Miss., June 6, 1995) (*Piney Woods V*).

---

[11]  In *Piney Woods IV*, we also held that, although royalty was payable on gas used as plant fuel, Shell owed nothing in this respect notwithstanding Shell's having simply ignored this item in their cost accounting, "because the plant fuel materially enhances the value of the gas (giving the royalty owners more than the at-the-well value for which they bargained), the cost of plant fuel must be borne by the royalty owners in proportion to their royalty share."  *Id*. at 857.

In *Piney Woods V,* the district court found that for section 107 wells after 1978 and for all wells after 1984 "the market value for deregulated Thomasville residue was the interstate market price, notwithstanding that it continued to be sold in the intrastate market pursuant to Shell's long-term contract." *Piney Woods V*, unpub. op. at 21. The district court made findings of fact as to which wells qualified for section 105 and section 107 status at particular times, the amounts available for the interstate market, and the value on that market, which the court determined by looking at comparable sales of record.

To determine Shell's liability for the years 1979-1986, the district court took the prevailing interstate market price for sweet gas and compared it to Shell's actual sales over those years. Based upon this analysis, the district court found Shell liable for underpayment of royalties during a period spanning November 1978, when the section 107 wells were "deregulated," until November 1982, when Shell entered into its "excess volume" contract with Transco and sold all of its section 107 gas on the interstate market. The royalties owed were to those owners of section 107 wells producing during this time period, with care taken after November 1982 not to include any amount sold at market price to Transco. The district court concluded that Shell had no liability for the period 1983 (December 1992)-1984 because during this time all section 107 well production was sold at the prevailing interstate market rate to

14

Transco.  The district court also found that, due to record evidence indicating that a downturn in the interstate market after 1982 left no prospective buyers in that market willing to contract for Thomasville gas, the royalty owners were not entitled to any damages for the years 1985-1986.[12]  Based upon these findings, the district court ordered the parties to re-calculate damages.

In his rebuttal to the parties' objections, the district court rejected Shell's contention that the opinion's approach to valuing the Thomasville gas was invalid because it did not properly focus on the value of the gas "at the wellhead," *i.e.*, as sour gas.  The district court noted that Shell itself had used the value of sweet gas under its long-term contract to compute royalties, that prior opinions of this Court blessed the sweet gas market value less processing costs analysis utilized,  and that "many years of litigation have never once revealed what the market value of sour gas at the well might be." *Piney Woods V*, unpub. op. at 33.  Shell also objected to the district court's finding that an interstate market was available during the years 1979-1982, an assertion which the district court found belied by the fact that all of the Thomasville plant's section 107 production, freed from commitment to long-term contractual obligations in 1982, was sold on that market to Transco in 1983-1984.  Addressing the plaintiffs'

---

[12]    The district court observed that the interstate market price fell steadily during this period.

objections to the finding of no underpayment in the years 1985-1986, the district court found the plaintiffs' assertion that Transco would have been willing to buy up *all* of the MisCoa contract gas had it been available "speculative" at best and therefore insufficient to meet their burden of proving market value.

Present appeals taken

On September 28, 1995, the district court filed an order expressly granting plaintiffs' motion for partial final judgment in accordance with Federal Rule of Civil Procedure 54(b), denying plaintiffs' motion for prejudgment interest, and denying Shell's motion for reconsideration of the "wellhead value" issue. On September 29, 1995, the district court entered a "Rule 54(b) judgment" to reflect the disposition of the June 6 order. On October 3, 1995, the plaintiffs filed a notice of appeal from this "Rule 54(b)" judgment, docketed in this Court under cause No. 95-60632. Shell also filed a notice of appeal and cross-appeal which, like the plaintiffs' appeal, was also docketed under No. 95-60632.

On December 18, 1995, the district court, on consideration of a motion filed by Shell in the district court and plaintiff's response thereto, signed and filed an order certifying the June 6 and September 28 orders for interlocutory appeal pursuant to 28 U.S.C. § 1292(b); that order was entered on the docket December 19,

16

1995.   On December 20, 1995, the plaintiffs filed a notice of appeal referencing the orders of June 6, September 28, and December 18 (and attaching a copy of the latter).  The plaintiffs' appeal was docketed in this Court as cause No. 95-60813.  On December 28, 1995, Shell filed with this Court a petition for permission to pursue an interlocutory appeal from the June 6 order under section 1292(b), which was docketed as our cause No. 95-00282.  To this point, we have neither granted nor denied leave to appeal under section 1292(b).  On January 16, 1996, Shell also filed a notice of appeal and cross-appeal in response to the December 18 order.  This cross-appeal was docketed, like the plaintiffs' appeal, under our No. 95-60813.

On February 8, 1996, this Court consolidated cause Nos. 95-00282 and 95-60632.  On April 26, 1996, this Court consolidated cause Nos. 95-60632 (consolidated) and 95-60813 for purposes of oral argument and final disposition.  Both parties have opted to submit one brief as to all consolidated appeals.

**Discussion**

I.  Appellate Jurisdiction

So far as the district court held plaintiffs were entitled to recovery for the years 1979 through 1982, its ruling does not dispose of the entirety of plaintiffs' claim—even assuming those years can be treated as a separate claim—because it does not award damages, and hence is not appealable under Rule 54(b).  *United*

17

*States v. Menendez*, 48 F.3d 1401 (5th Cir. 1995); *Pemberton v. State Farm Mutual*, 996 F.2d 789 (5th Cir. 1993); *Goodman v. Lee*, 988 F.2d 619 (5th Cir. 1993).[13]  However, the district court by its December 18, 1995, order, certified its June 6, 1995, order for interlocutory appeal under section 1292(b), and on December 28, 1995, Shell filed in this Court its Fed. R. App. P. 5 petition for permission to appeal the June 6, 1995, order.  We now grant Shell leave to appeal that order.

The situation as to the plaintiffs is somewhat different. Arguably the June 6, 1995, order was certifiable and certified under Rule 54(b) so far as it denied plaintiffs any recovery for years after 1982.[14]  Two questions present themselves, however.

---

[13]  In its June 6, 1995, order, the district court, although making findings regarding the interstate market price and Shell's resultant liability, made no apportionment of gas quantities between particular section 107 and section 105 wells and also failed to specify the quantities of section 107 gas redirected to Transco's pipeline at market rates in the latter part of 1982. Accordingly, and due to the complex nature of the case and the ongoing factual disputes and discrepancies concerning royalties owed and the ownership interests involved, the anticipated determination of the amount of damages cannot possibly be characterized as merely "ministerial."

[14]  And, if this is so, then plaintiffs' October 1995 notice of appeal properly brings before us the district court's denial of recovery for years after 1982.
Plaintiffs' October 1995 notice of appeal does not, however, bring forward the denial, by the district court's September 28, 1995, order, of plaintiffs' claims for prejudgment interest as to the years 1979-1982, because, as explained in the text above, no district court order has been entered disposing of the entirety of any of plaintiffs' claims respecting any of those years in that the right to recovery has been established but not the amount of damages.  As we ultimately affirm the district court's holding that

18

First, it is not entirely clear that the years after 1982 represent an entire claim (or claims), as opposed to being merely part of a single claim for royalty for the entire period after November 1978. If the latter, Rule 54(b) certification is not available. We are inclined to view the years after 1982 as presenting a separate claim, not as being merely part of a larger, single indivisible claim. Second, the district court's actual Rule 54(b) judgment of September 29, 1995, states that the court "hereby enters judgment in favor of the plaintiffs pursuant to" the June 6, 1995, opinion. Arguably, the district court meant to certify under Rule 54(b) only the grant of relief for the years 1979-1982, not its denial for the years after 1982. We reject this contention. We read the September 29, 1995, order as certifying the June 6, 1995, order, just as if it had read "enters judgment in favor of the plaintiffs to the extent, but only to the extent, provided in the June 6, 1995, order." To read the September 29 order as certifying under Rule 54(b) only the granting of relief (without fixing damages) for 1979-1982, but not the denial of relief for years after 1982, would be to read the order as intending to certify under Rule 54(b) only that which could not be so certified without intending to certify that which could be certified. Moreover, the September 29 order, as well as that of September 28, reflects that the court granted plaintiffs' motion for certification under Rule 54(b). Although

plaintiffs are entitled to no recovery for years after 1982, the question of prejudgment interest as to those years does not arise.

19

that motion is not in the record, we assume it was to certify the only thing plaintiffs would have standing to appeal, namely the denial of relief.  Accordingly, we have jurisdiction under Rule 54(b) of plaintiffs' challenge to the district court's denial of relief for the years following 1982.

The same jurisdictional result can perhaps also be justified under section 1292(b).  *See Demelo v. Woolsey Marine Industries, Inc.*, 672 F.2d 1030 (5th Cir. 1982).  Plaintiffs argue, and Shell agrees, that we can review the entire June 6, 1995, order as it is all before us by virtue of Shell's December 28, 1995, petition for permission to appeal under Fed. R. App. P. 5 and the doctrine that under section 1292(b) "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court."  *Yamaha Motor Corp. USA v. Calhoun*, 116 S.Ct. 619, 622 (1996).  *See also Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976, 983 n.16 (5th Cir. 1985).[15]  This principle has been applied to

---

[15]    Plaintiffs also argue (but Shell disputes) that this same principle brings up the September 28, 1995, order denying their claim for prejudgment interest, because that order, as well as the order of June 6, 1995, was certified under section 1292(b) by the district court's December 18, 1995, order.  We disagree because Shell's December 28 petition for permission to appeal sought to appeal only the June 6 order.  A section 1292(b) appeal does not extend to any orders other than that which is both properly certified and as to which a timely petition for permission to appeal is filed.  *See United States v. Stanley*, 107 S.Ct. 3054, 3060 (1987); *Adkinson v. International Harvester Co.*, 975 F.2d 208, 211 n.4 (5th Cir. 1992); *FDIC v. Dye*, 642 F.2d 833, 837 & n.6 (5th Cir. 1981).

allow a party who did not seek permission to appeal to defend the order certified under section 1292(b) on a basis other than the controlling issue specified in the district court's certification order, just as an appellee in an ordinary appeal under 28 U.S.C. § 1291 may, without taking a cross-appeal, defend the judgment below on a ground not relied on by the district court. *See Armstrong v. Bush*, 924 F.2d 282, 296 n.13 (D.C. Cir. 1991); *Consolidated Express, Inc. v. N.Y. Shipping Ass'n*, 602 F.2d 494, 501-502 (3d Cir. 1979). However, the general rule, like that in section 1291 appeals, *Speaks v. Trikora Lloyd*, 839 F.2d 1436, 1439 (5th Cir. 1988); *Shipp v. General Motors*, 750 F.2d 418, 428 (5th Cir. 1985), is that a party cannot procure a modification favorable to it of an order certified under section 1292(b) absent that party's having timely applied for permission to appeal, even though the opposite party did so timely apply and permission was granted. *See, e.g., Tranello v. Frey*, 962 F.2d 244, 248 (2d Cir. 1992); *Luria Steel & Trading Corp. v. Ogden Corp*., 484 F.2d 1016, 1019, 1023-24 (3d Cir. 1973). *See also Rodriguez v. Banco Central*, 917 F.2d 664, 668-669 (1st Cir. 1990). *But see Armstrong v. Executive Office*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) (apparently *contra*, but unclear). So, the question of section 1292(b) jurisdiction over plaintiffs' challenge to the district court's denial of relief for years after 1982 would seem to turn on whether plaintiffs timely requested permission to appeal. The district court's December 18, 1995,

21

order was entered December 19, 1995; plaintiffs' notice of appeal was filed in the district court on December 20, 1995, was received in this Court on December 28, 1995, and was docketed here on December 29, 1995, and was thus before this Court "within ten days of the entry of the order" of December 18 as section 1292(b) requires for an application for permission to appeal. An ordinary notice of appeal under section 1291 does not constitute an application for permission to appeal as required by section 1292(b). *Aucoin v. Matador Services, Inc*., 749 F.2d 1180 (5th Cir. 1985); *Aparicio v. Swan Lake*, 643 F.2d 1109, 1111 (5th Cir. 1981). However, this December 20, 1995, notice of appeal is not an ordinary section 1291 notice, as it not only specifically mentions section 1292(b), but also, by attaching and referring to a copy of the district court's December 18 order, identifies the issues and the need for immediate appeal. In *Aucoin*, we observed that the notice of appeal there lacked "a statement of the basis for a discretionary appeal" and stated "we do not rest on form for its esthetics; rather, we look to function." *Id*. at 1181. *Aucoin* also points to the desirability of the appellate court's being called on to assess whether to allow an appeal at a time relatively close to the trial court's certification. *Id*. In neither *Aucoin* nor *Aparicio* had any party ever filed with this Court an application for permission to appeal under section 1292(b). Plaintiffs' December 20 notice of appeal contains the important information

22

called for by Fed. R. App. P. 5(b), and its only substantive deficiency is that it does not specifically ask us to issue an order granting permission to appeal; yet such a request was timely before us as to the June 6, 1995, order by Shell's December 28 Fed. R. App. P. 5 application. Applying the *Aucoin* standard, under all these circumstances it is not too much of a stretch to treat plaintiffs' notice of appeal as minimally meeting the requisites of a Fed. R. App. P. 5 application to "cross appeal."[16] Accordingly, to resolve any doubts which might arise as to the efficacy of plaintiffs' Rule 54(b) appeal from so much of the June 6, 1995, order as denied them any recovery for the years after 1982, we treat plaintiffs' notice of appeal received in this Court on December 28, 1995, as an application for permission to appeal under section 1292(b) and we grant the application so far only as it relates to the June 6, 1995, order.

However, assuming *arguendo* that plaintiffs' December 1995 notice of appeal could properly be treated by us as a section 1292(b) application for permission to appeal the district court's

---

[16] We note that in *Cobb v. Lewis*, 488 F.2d 41, 53 (5th Cir. 1974), we treated an application for permission to appeal under section 1292(b) as a section 1291 notice of appeal. In *Tranello*, the Second Circuit was careful to point out that nothing by the putative "cross-appellant" was filed in the court of appeals within the section 1292(b) ten-day period; in *Luria Steel & Trading Co.*, there was never an attempted "cross-appeal" of any kind; and in *Rodriguez*, the court pointed out that the "cross-appellant's" notice of appeal, though filed in the district court within ten days of the entry of the section 1292(b) order, was not received in the court of appeals until well after the ten-day period had run.

23

September 28, 1995, denial of prejudgment interest respecting the years 1979-1982, we deny leave to appeal that matter. The September 28, 1995, order denying prejudgment interest as to those years is plainly not appealable under section 1291 and Rule 54(b), and we have at no relevant time been requested to grant leave to appeal that order. The June 6 order does not address prejudgment interest. Shell has reasonably taken the position that prejudgment interest is not properly before us. Moreover, resolving that question would do little to materially advance the ultimate termination of the litigation, as, if there is any right to recover actual damages, those must still be ascertained and quantified in any event, and the additional calculation for prejudgment interest, if any, would then become an essentially ministerial or mechanical task. Ruling now on prejudgment interest does not hold much potential for saving significant further proceedings in the district court.

The upshot of all this is that plaintiffs' entitlement to prejudgment interest is not properly before us. What is properly before us is Shell's complaint that the district court erred in holding it had underpaid royalty for the years 1979-1982, and the district court's holding that Shell had not underpaid for the years after 1982. As to the latter, however, we consider only the years 1985 and 1986, as those are all plaintiffs complain of in their brief (their complaints as to the years 1983 and 1984 are hence waived).

24

We turn at last to the merits.

*II.   The District Court's June 6 Order Determining Liability*

*A.   Standard of Review*

The case below was tried before the district court.  We therefore review all factual findings for clear error and conclusions of law *de novo*.  *Peaches Entertainment v. Entertainment Repertoire*, 62 F.3d 690, 693 (5th Cir. 1995).

Both parties challenge, at different junctures, the district court's findings regarding the prevailing "market value" for Thomasville gas, findings which bear upon both Shell's contractual liability and the amount of any damages that might be owed.  Market value is "what a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, would agree to take and pay with a reasonable expectation that the [FERC] would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity."  *Piney Woods IV*, 905 F.2d at 852 (internal ellipses and brackets omitted), *quoting Weymouth v. Colorado Interstate Gas Co.*, 367 F.2d 84, 90 (5th Cir. 1966).  "Market value is a question of fact, and it is up to the fact finder to determine the probative strength of relevant evidence."  *Piney Woods II*, 726 F.2d at 238.  We review the district court's findings mindful that under Mississippi law "the royalty owners, as plaintiffs, bear the burden

25

of going forward with sufficient evidence to prove their damages by a preponderance of the evidence." *Piney Woods IV*, 905 F.2d at 845 (citation omitted) (internal quotation marks and brackets omitted). Finally, although Mississippi law requires that the existence of damages be reasonably certain and susceptible to pecuniary valuation before relief can be granted, the plaintiffs will not be denied recovery merely because some measure of speculation and conjecture is required in determining the amount of damages. *Id.*, 905 F.2d at 945-946 (citations omitted).

*B. Shell's Liability for 1979-1982*

We are here concerned only with gas from the section 107 wells (see note 9, *supra*, and accompanying text).

In *Piney Woods II*, this Court approved three methods of determining market value in this case. The preferred method, comparable sales of sour gas, did not exist and according to the district court continued to elude evidentiary substantiation in 1995. "The next-best method is to examine sales of sweet gas and sulfur, to determine the market value of the products resulting from processing at the Thomasville plant," whereupon "[p]rocessing costs may . . . be deducted as an indirect means of determining what a buyer would have paid for the sour gas at the wellhead." *Piney Woods II*, 726 F.2d at 240. This was the method utilized by the district court in the instant case.

In *Piney Woods IV*, this Court affirmed the district court's

ruling rejecting the plaintiffs' proof for the years 1972-1978 on the ground that the proffered proof of comparable sweet gas sales was flawed. Now, however, the district court, relying upon four long-term contracts involving the sale of sweet gas processed from sour gas from Mississippi fields, has derived a mean rate scale demonstrative of the "interstate market value" for processed sour gas. This index of market value, when juxtaposed to the actual prices paid under the Shell-MisCoa long-term contract, illustrates Shell's liability and provides the basis for a calculation of damages.

We affirm the district court's use of these sales and the "interstate market value" derived therefrom. These sales contracts exhibit geographical, market output, and gas quality characteristics markedly similar (and in one case identical) to those of the Thomasville facility,[17] overcoming the inadequacies in the plaintiffs' showing for the years 1972-1978 which we remarked

---

[17] The Shell-MisCoa contract, made in 1972, had a term of 13 years, with provisions for extension, and involved the sale of section 105 and section 107 pipeline quality sweet gas processed from sour gas, with a daily deliverability quota of 40,000 Mcf. The "interstate market value" found by the district court is based upon four comparable sales contracts: Amerada Hess-Transco (P-136), Pursue-Southern Natural (P-137), Shell-Transco (P-138), and Tomlinson-Transco (P-139). All of these contracts concern only section 107 pipeline quality gas. The Pursue, Shell, and Tomlinson contracts concern sour gas produced in Rankin County and processed on site into sweet gas. The Amerada Hess, Shell, and Tomlinson contracts have terms of fifteen years and were entered into between 1978 and 1982, while the Pursue contract extends for the life of the field. All of the contracts set daily deliverability quotas at different levels: Amerada Hess (50,000 Mcf), Pursue (180,000 Mcf), Shell (54,000 Mcf), Tomlinson (33,500 Mcf).

upon in *Piney Woods IV*. These sales contracts further demonstrate both the existence of willing buyers on the interstate market between 1979-1982 and reveal a discernible market price for sweet gas processed from section 107 sour gas wells producing during this time period, *i.e.*, the Spengler, Garrett, Stevens, and Clark wells. The district court did not clearly err in its determination of the market value of processed gas.

However, the determination of the market value of processed gas is only part of the equation for determining the "market value" of the Thomasville gas "at the well," the value on which Shell should have computed royalty. "The method of analysis approved in *Piney Woods II* for assessing the market value of Thomasville's ultra-sour gas at the wellhead by using comparable sweet gas sales was to take the price established for the sweet gas market, then deduct the processing costs inherent in changing the sour gas to sweet gas, and thus arrive at the price of sour gas at the wellhead." *Piney Woods IV*, 905 F.2d at 848. We have previously observed that this formula of sweet gas value-minus-processing costs serves as a proxy, "an indirect means of determining what a buyer would have paid for the sour gas at the wellhead." *Piney Woods II*, 726 F.2d at 240. Accordingly, we have emphasized that any consideration of Shell's processing costs—which under Mississippi law as applied to both "amount realized by lessee, computed at the mouth of the well" and "market value at the well"

28

lease provisions are not deductible *as such*—is necessitated by the absence of comparable sales of sour gas establishing a market (or actual sales) price for the gas prior to processing. *Id*.

In addition, this Court in *Piney Woods II* held that only *reasonable* processing costs could be considered for such purpose, noted that although the district court had not made an express finding as to the reasonableness of the processing costs deducted by Shell, the record would support such a finding, and left that issue "open for further consideration by the district court." *Id*., 726 F.2d at 241. Following our *Piney Woods II* remand, the district court (in *Piney Woods III*), as we noted in *Piney Woods IV*, "found that Shell's 'plant processing' charges were reasonable." *Piney Woods III*, 905 F.2d at 843. *Piney Woods IV* did not disturb that finding.

Shell's central argument on appeal challenges the district court's use of Shell's *actual* processing costs in determining the wellhead value of the gas. Shell argues that this approach ignores variables like capital investment, risk, and profit motive, factors which any willing buyer of Rankin County sour gas would have to take into consideration before entering into a long-term contract to process, market, and transport that gas. Shell also points out that inflationary factors have increased the costs of plant construction beyond that of the Thomasville facility, built in the early 1970s, and posits that insofar as inflation is a factor in

29

increased market prices during the relevant time frame a variable should be introduced to account for an extrapolated increase in costs.

Insofar as Shell claims that "processing costs" are something other than its actual costs, any proper consideration of that argument must begin with our foundational opinion in *Piney Woods II*. There we addressed plaintiffs' challenge to Shell's practice of deducting its actual processing costs from its actual tailgate sales proceeds to determine royalty due. We rejected this challenge, and sided with Shell, *both* as to leases (such as the "Producers 88 (9170)", see notes 2 & 3 *supra*) providing for royalty to be based on the "amount realized by lessee, computed at the mouth of the well" and as to leases providing for royalty based on "market value at the well." We stated:

> "*Expenses incurred* after production may be charged against royalty computed 'at the well'. 3 H. Williams, Oil and Gas Law § 645 (1981). Accordingly, *the costs* of processing and transportation maybe deducted.
>
> . . . 'at the well' refers not only to the place of sale but also to the condition of the gas when sold. 'At the well' means that the gas has not been increased in value by processing or transportation. *It has this meaning in conjunction with 'value' or 'amount realized'* as well as with 'sold'. The lessors under these leases are therefore entitled to royalty based on the value or price of unprocessed, untransported gas. [citation]. On royalties 'at the well,' therefore, the lessors may be charged with processing costs, by which we mean all *expenses*, subsequent to production, relating to the processing, transportation, and marketing of gas and sulphur.
>
> We emphasize, however, that processing costs are

30

chargeable only because, under these leases, the royalties are based on *value or price at the well. Processing costs may be deducted only from valuations or proceeds that reflect the value added by processing.*" *Id*. at 240 (emphasis added).

We went on to say:

> "The lessors are entitled to gas royalty at the well. This means royalty based on the value or price of the sour gas before it is separated into marketable constituents. The value or sale price of the residue sweet gas reflects *Shell's* processing costs.
>
> We agree with the plaintiffs that the processing costs,under *both* the "market value" and "amount realized" provisions, must be reasonable." *Id.* at 241 (emphasis added)

And, we concluded "[t]o determine the correct basis for royalty, processing and transportation costs may be deducted from values or prices established for processed and transported gas." *Id*. at 242.

Nothing in our discussion of "processing costs" indicates that the "expenses" to which we referred were hypothetical or derivative in nature; rather, given the nature of the plaintiffs' challenge, we were plainly addressing the processing, transportation, and marketing expenses actually incurred by Shell (and actually passed on to the royalty owners)—"Shell's processing costs." Furthermore, this was applicable to both the "market value" and the "amount realized" lease provisions. This view is reinforced by our reliance in the above *Piney Woods II* passage on the general rule that where the lease calls for royalty to be "computed 'at the well'" the "[e]xpenses incurred after production" are deducted. Obviously, this refers to the lessee's actual expenses (to the

31

extent reasonable), as reflected by the treatise we cited in support of that proposition. *See Williams & Meyers* (Martin & Kramer), *Oil & Gas Law,* § 645.2 (1996 Ed).

Contrary to the manifest implication of the above referenced *Piney Woods II* passages, however, Shell seizes upon one passage from *Piney Woods II* as a foundation upon which to construct its argument. Our initial observation is that the passage Shell seizes upon occurs in Part VIII of that opinion, in which we addressed Shell's practice of disregarding gas used for plant fuel in computing royalty, and not Part VII of the opinion, our discussion of the propriety of Shell's deduction of processing costs in computing royalty. The passage upon which Shell relies, which follows a brief discussion of the accounting methodologies applicable to the plant fuel question, states:

> "Finally, processing costs are not per se chargeable to market value royalty. They must be *reasonable* costs, and the market value of sour gas may be more or less in a given time period than the value of the finished products less processing expenses." *Piney Woods II*, 726 F.2d at 241.

Shell contends that this statement implies the existence of a "value added" component which is not reflected by the simple formula of processed gas market value minus actual costs. But such is not necessarily the meaning of that passage. The limitation, which we emphasized, that the costs must be "reasonable" suggests otherwise. Further, it is not clear that "the value of the finished products" refers to their market value, as opposed to

32

their sales proceeds; if the latter, the statement merely recognizes that if the "market value" of the gas at the wellhead is determined either by using comparable sales of sour gas or through the proxy of comparable sales of sweet gas-less-processing costs the result may well differ from the method utilized by Shell in computing royalties, *i.e.*, the actual sales price of processed Thomasville gas, "the value of the finished products," less processing costs. Moreover, Shell had never actually accounted to the lessors for any royalty on gas used as plant fuel, it had merely assumed it was "a wash". *Id*. at 241. We were at that point unwilling to simply make that assumption, and remanded that matter to the trial court. Ultimately, in *Piney Woods IV* we sustained the district court's ruling for Shell on remand in this respect (*Piney Woods III*), and we accepted Shell's contention "that it owes the royalty owners nothing [respecting gas used for plant fuel], as the royalty payments on plant fuel that would have been due to them are exactly balanced by the share of the processing costs that are to be borne by the royalty owners." *Id*. 905 F.2d at 856. We concluded "because we find that plant fuel *is* a processing cost, we read our *Piney Woods II* decision as merely ratifying as correct the existing course of performance [as to plant fuel] on the royalty contract . . . ." *Id*. 905 F.2d at 857.

In sum, the two brief above quoted sentences from the part "VIII. *Plant Fuel*" portion of our *Piney Woods II* opinion, which

33

Shell relies on, do not suffice to overcome the clear thrust of that opinion as a whole, namely:  that in the absence of comparable sales of sour gas, the best method of determining market value at the well was to determine the market value of the sweet gas sold by Shell at the Thomasville plant, by examining comparable sweet gas sales, and then deduct Shell's actual processing and transportation costs applicable to its Thomasville gas, so far as those costs were reasonable.  Moreover, this is plainly what in *Piney Woods IV* we contemplated the district court would do if, following our remand there, it found comparable sales of sweet gas sufficient to reflect market value of the Thomasville sweet gas in years after 1982.

We further determine that Shell's evidence presented following our *Piney Woods II* remand—no further evidence having been presented following our *Piney Woods IV* remand—does not compel a different conclusion.

Shell presented the testimony of two expert witnesses who attempted to postulate the construction and investment costs inherent in the processing, transportation, and marketing of sour gas by considering the construction of a hypothetical on-site processing facility analogous to Shell's Thomasville facility. Shell's point was that a willing buyer of the *sour* gas produced at the plaintiffs' wells would have to construct such facilities in order to market the gas because no market for unprocessed gas exists.  The figures Shell used were based upon a database

34

containing information gathered from its worldwide operations and comparable information describing other firms' ventures. The price tag determined under the Shell model took into account the costs of investment, construction, and inflation, as well as the profit motive of a prospective willing buyer, on a recurring annual basis.

The district court concluded that Shell's model was fraught with supposition and built upon unsubstantiated conjecture. We are unable to say that this finding is clearly erroneous.[18]

In sum, nothing in Shell's "value added" argument convinces us that the district court erred in law, or was clearly erroneous, in concluding that Shell's approach would not produce a determination of the section 107 gas's market value at the wellhead more precise than that made by the district court. Shell's recourse to an increasingly recondite panoply of databases, charts, and indexes reeks of the abstruse and arcane, could properly be found to be susceptible to manipulation due to its amorphous quality, to resist empirical validation, and to offer the prospect of interminably prolonging this twenty-three-year-old case.

We again reiterate that in *Piney Woods II* we held that where comparable sales of sour gas were not available, the next best

---

[18] Shell's actual costs of capital investment (as well as its actual operating costs) appear to have been passed on to the royalty owners as processing costs. *See Piney Woods II*, 726 F.2d at 240. What is at stake in this litigation is not compensation for Shell's investment (and actual operating costs) in the Thomasville facility, but rather the distribution of hypothetical profits above and beyond those costs.

35

method of determining market value at the well was to first determine the market value of the Thomasville plant processed gas, if this could be done by evidence of comparable sweet gas sales, and then deduct Shell's actual plant operations and transportation costs, to the extent those were not unreasonable. Nothing in *Piney Woods IV* changed that. And, that is what the district court did. Moreover, we pointed out in *Piney Woods II* that "[m]arket value is a question of fact, and it is up to the factfinder to determine the probative strength of relevant evidence." *Id*. 726 F.2d at 238. And, we further stated that " . . . if, on remand, the search for better measures of market value at the well proves unsuccessful or inordinately burdensome, we think its the duty of the district court to decide the question as best it can on the basis of the evidence that it presented." *Id*. at 239. Again, that is what the district court has done. Its determinations are not clearly erroneous or infected by legal error. Shell's hypothetical cost contentions present no basis for reversal.

Shell raises two other arguments against the district court's imposition of liability. Shell first posits that in *Piney Woods IV* we held it was under no duty to renegotiate its contracts to enter the interstate market and thus now cannot be held liable for failing to perfect sales contracts commensurate with that market rate. *Piney Woods IV*, 905 F.2d at 854-855. In a related contention, Shell argues that although its section 107 gas

36

theoretically could have been sold on the interstate market for greater than its section 105/long-term contract prices, it was under no obligation to transfer section 107 gas from the intrastate to the interstate market. In regard to this latter submission, Shell notes that the regulatory regimes which govern the intrastate and interstate markets are significantly different and argues that such a difference in "legal quality" militates against the district court's ruling.

Regarding Shell's first point, the *Piney Woods IV* language relied upon by Shell dealt solely with the plaintiffs' claim that Shell was obligated to renegotiate its long-term contract to obtain rates more in accord with those prevailing on the interstate market. In rejecting that contention, we made it clear that we were addressing only section 105 gas, for which Shell's long-term contract price as of November 1978, *was* also the maximum lawful price Shell could charge. *Piney Woods IV*, 905 F.2d at 851. In other words, we found that section 105 effectively limited the market *for section 105 gas* to Shell's long-term contract, vindicating Shell's actual sales price-less-processing-costs royalty basis *as to gas governed by section 105*. Shell's present argument completely ignores our reasoning in vacating and remanding the district court's decision as to 1979-1986, namely the fact that Thomasville section 107 gas was eligible for sale on the burgeoning interstate market. Shell's failure to renegotiate its long-term

contract is essentially irrelevant to a determination of what the proper "market value" of that section 107 gas was. Shell's submission is without merit.

Shell's second argument revolves around language excerpted from our discussion in *Piney Woods IV* concerning Shell's lack of a duty to redrill its wells:[19]

> "In *Piney Woods II, id.* at 239 n. 17, we quoted from [*Exxon v. Middleton*, 613 S.W.2d 240, 246-247 (Tex. 1981)], which stated that comparable sales are those made in the same category of a regulated market. Under this method of assessing market value, Shell as lessee must pay royalties on the market price of gas under the existing regulatory scheme governing each well but is not necessarily required to act to change the regulatory scheme to achieve higher prices." *Piney Woods IV*, 905 F.2d at 855.

Shell's argument in essence adopts the *Piney Woods IV* principle that there is no duty to change the relevant regulatory scheme and applies it to section 107 gas by attempting to bifurcate the section 107 regulatory regime we recognized in *Piney Woods IV* into intrastate and interstate components. The gas we are concerned with in this portion of the opinion, however, falls within the regulatory regime of section 107; unlike section 105 gas, Shell's long-term "intrastate" contract price does not define the upper reaches of the market for this gas, a fact reflected by the 1982 Shell-Transco contract. Indeed, Shell has cited no statute or

---

[19] Redrilling the section 105 wells to over 15,000 feet in depth would have resulted in those wells being reclassified as section 107 wells. *See* note 6, *supra*.

38

regulation, federal or state, which erected any legal barrier to the sale of section 107 gas on the interstate market. This argument is at its core only another of Shell's persistent attempts to define the available market in terms of its long-term contract rather than by reference to existing comparable contracts, in derogation of our holding in *Piney Woods II*. Accordingly, we reject it.

We affirm the judgment of the district court holding that Shell is liable for underpayment of royalty for the years 1979-1982.

*B. 1983-1984*

The district court found that during this period, beginning in November of 1982, all available section 107 gas was sold to Transco at an interstate market price. Thus, Shell's actual sales price for this period reflects the market rate. Neither party challenges this holding, and we discern no error in it. Accordingly, the district court's judgment absolving Shell of liability for the years 1983-1984 is affirmed.

*C. 1985-1986*

Plaintiffs contend that the district court clearly erred by finding that there was no competitive interstate market during this time period for section 105 gas deregulated as of January 1, 1985. Plaintiffs base this contention on the Shell-Transco contract,

which obligated Transco to take up to 54,000 Mcf per day, which was more than the Thomasville plant's 40,000 Mcf per day delivery capacity. The plaintiffs, noting that the district court accepted the Transco contract price as the interstate market price during 1983-1984 but abandoned this analysis thereafter, argue that the admitted downturn in the interstate market can be tracked by the "market out" options Transco utilized to reduce its contract price throughout this period.

The record reveals that due to the interstate market's downturn after 1982, numerous interstate pipeline corporations, like Transco, were refusing to take delivery or pay for gas under existing contracts. Transco in particular markedly reduced its takes during this time. Furthermore, the Shell-Transco contract was an "excess volume" contract subject to the preexisting MisCoa contract and therefore presupposed the limitation on available gas resulting from the MisCoa contract.

The district court's finding that no additional buyers were present on the rapidly fading interstate market after 1982 is supported by the record. The record suggests further that Transco was the only viable buyer in that market for the relevant time period. We agree with Shell that the nature of the Shell-Transco contractual relationship is an adequate basis on which the fact finder may properly reject, as unduly speculative, any suggestion that plaintiffs had shown Transco would have purchased section 105 gas which was freed of the Shell-MisCoa contract. Furthermore, the

fact finder could properly take into account that there was no showing that had Transco been forced to take all of Thomasville's 40,000 Mcf output it would not have exercised its "market-out" option to further reduce the contract price to one nearly identical to the MisCoa contract rate. The burden of proving market value includes proof of buyers willing to accept available deliveries, and the district court was not clearly erroneous in concluding that plaintiffs had failed to carry that burden. Finding no clear error, we affirm this portion of the district court's order as well.

*III. Other Matter*

Shell argues that due to the post-1982 downturn in the interstate market the MisCoa contract price for the years 1982-1986 actually *exceeded* the interstate market price and therefore Shell is entitled to equitable recoupment of overages on royalties paid to the plaintiffs during those years. Shell bases this argument upon the proposition that the prices paid by Transco pursuant to a contract entered into in 1982 cannot represent the market value in 1983-1986. Shell posits that because the plaintiffs could identify no new buyers on the interstate market, the market was practically valueless and therefore offered rates far below the MisCoa long-term fixed rate contract price.

Assuming *arguendo* that Mississippi law allows for equitable recoupment, *see Glantz Contracting Co. v. General Electric Co.*, 379

So.2d 912 (Miss. 1980), no pleading of record evidences Shell's intention to pursue an equitable recoupment theory. *See* Fed. R. Civ. Pro. 8(c); *Davis v. Odeco Inc.*, 18 F.3d 1237, 1246 (5th Cir.), *cert. denied*, 115 S.Ct. 78 (1994); *Chicago Great Western Ry. Co. v. Peeler*, 140 F.2d 865, 868 (8th Cir. 1944); *J.V. Edeskuty & Assoc. v. Jacksonville Kraft Paper*, 702 F. Supp. 741, 749 (D. Minn. 1988). Nor does it appear that this theory was proffered in the trial court prior to the district court's December 1994 issuance of the preliminary draft of the June 6 order. Furthermore, we note that Shell's claim is improperly based essentially upon a dearth in the plaintiffs' proof. In *Piney Woods II* we set out a hierarchy of three modes of analysis in determining what constitutes the relevant "market value" in this case; given our affirmance of the district court's finding that the plaintiffs' proof of comparable processed sweet gas sales for this post-1982 period fails, the applicable analysis is by default that of Shell's actual sales-minus-processing-costs system. Had Shell properly counterclaimed or pleaded recoupment in its answer to plaintiffs' claim, it could conceivably have offered evidence of a relevant market where prices were less than what Shell actually charged. No such pleadings exist, however, and even if they did Shell has not met its postulated burden of proving up the existence and parameters of such a hypothetical marketplace. Shell's claim for equitable recoupment fails.

42

Finally, Shell has briefed the issue of whether, due to the district court's rulings, it will be necessary and proper on remand to send notices to those prospective plaintiffs whose claims have exceeded the jurisdictional amount since the class was originally certified.  This question has not yet been ruled on in the district court and is not materially related to any issue presented by the June 6, 1995 order we review today.  We therefore have no occasion to reach the class notice issue at this time.

## Conclusion

We affirm the district court's June 6, 1995 order, and hold that plaintiffs are entitled to recover from Shell for underpayment of royalty for the period November 1978 through  November 1982 with respect to the section 107 wells.  We approve the comparable sales evidence utilized by the district court in determining the interstate market value for processed gas and the propriety of subtracting from that market value Shell's actual processing costs to determine the market value of the gas "at the well."  Damages shall be calculated accordingly, without recoupment or set-off for any asserted post-1982 overpayment by Shell.  We do not have before us, and do not reach, either the issue of plaintiffs entitlement to prejudgment interest or the question of whether further notice to class members is required.  As to periods after November 1982, we affirm the district court's determination that Shell has not

43

underpaid royalty and is not liable to plaintiffs.

The district court's June 6, 1995 order is AFFIRMED, and the cause is REMANDED for further proceedings consistent herewith.